UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KELLY FAYE HUGHES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-02373-AGF |
| | ) | |
| MISSOURI BAPTIST UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the motion of Defendant Missouri Baptist University ("MBU") for summary judgment (ECF No. 28) with respect to Plaintiff Kelly Faye Hughes's claims asserting violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), negligence, and breach of contract.  For the reasons set forth below, MBU's motion will be granted in part and denied in part.

## BACKGROUND

Viewing the evidence and all reasonable inferences in the light most favorable to Hughes for purpose of the motion before the Court, the record establishes the following.[1] MBU is a religious institution of higher education that receives federal financial assistance.  Hughes enrolled in MBU as a student athlete in the fall of 2016.  Hughes

---

[1]    To the extent that Hughes has denied any of MBU's properly supported statements of uncontroverted material facts based solely on her lack of sufficient personal knowledge of the purported fact, without more, the Court has deemed such facts to be admitted.  *See* Fed. R. Civ. P. 56(c), (e).

played on MBU's volleyball team.  During her freshman year, she had an "on-again and off-again" relationship with a fellow freshman student (referenced herein as "FS"),[2] also a student athlete playing for the MBU football team.

As sophomores, Hughes and FS were both residential students, living on MBU's campus in the fall of 2017.  During MBU's Welcome Weekend on August 18, 2017, Hughes and FS attended an off-campus party. Sometime after returning to campus early in the morning of August 19, 2017, Hughes and FS entered her vehicle, parked in the MBU residence hall parking lot, removed their clothing, and had sexual intercourse. Hughes asked FS to stop twice prior to sexual intercourse and he stopped both times, but when Hughes asked FS to stop a third time, FS continued to have intercourse with Hughes.  Hughes last communicated with FS on August 27, 2017.

During the 2017-2018 academic year, MBU had the following relevant student policies in place: Policy on Sexual Assault and Relationship Violence; Restorative Justice Policy; and MBU 2017-2018 Student Handbook ("Student Handbook").  MBU had also issued a Statement of Sexual Behavior and Resident Life Policy that was in effect during the 2017-2018 academic year, which prohibited students from engaging in acts of sexual intercourse on campus.

The Policy on Sexual Assault and Relationship Violence served as MBU's Title IX policy and was available to students in multiple locations, including on MBU's

---

[2]      The parties have agreed to file pleadings under seal or otherwise not disclose the name of the fellow student in light of concerns related to the Family Educational Rights and Privacy Act (FERPA) and the sensitive nature of Hughes's allegations.

website and in the Student Handbook.  The policy defined the terms "consent,"

"stalking," "dating violence," "domestic violence," "sexual assault," "sexual

harassment," and "sexual exploitation," and provided that students found responsible for

sexual assault—defined as any sexual contact or any attempted or actual sexual

penetration without consent—and certain other sexual misconduct may face a range of

sanctions, including suspension or expulsion.  The policy provided that sexual assault and

relationship violence complaints would be investigated by MBU's Title IX investigator

within a reasonable amount of time; that the purpose of the investigation was to establish

whether there was a reasonable basis for believing the alleged violation of policy

occurred; that the investigation would include an interview with the complainant, the

respondent, and any relevant witnesses; that the standard of proof would be a

"preponderance of the evidence"; that the Title IX coordinator would determine whether

a violation of policy likely occurred and, if so, the appropriate sanctions; and that the

Title IX coordinator would notify the complainant and the respondent simultaneously in

writing regarding all outcomes of the investigation, including appeal procedures.  The

policy included procedures for campus disciplinary procedures and for appeal of

sanctions issued against a student.  *See generally* ECF No. 30-2, Def.'s Ex. 2.

**Initial Report to MBU**

Hughes shared the details of FS's sexual assault[3] with her roommates later in the

morning of August 19, 2017, but she did not report the assault to any MBU official until

---

[3]     The Court will use the term "sexual assault" to describe the August 19, 2017
incident as that is the term primarily used by Hughes in her brief.

she observed a message requesting prayers for the false allegations against FS on an athletic training office whiteboard on August 30, 2017.[4]  On August 31, 2017, Hughes spoke with an MBU athletic trainer about the message on the board and the details of the sexual assault.  This was Hughes's first report to MBU of the assault.  The athletic trainer immediately brought Hughes to MBU's Office of Public Safety, where Hughes gave a statement regarding the incident to MBU's Director of Public Safety, Stephen Heidke.  Heidke also served as a Title IX investigator for MBU at that time.  Heidke created a case report within MBU's safety record system.  In it, Heidke reported that Hughes stated "that she did not want to pursue any prosecution against [FS] as she was complacent [sic] in this event by taking her clothes off."  ECF No. 30-11, Def.'s Ex. 11.   However, in her deposition in this case, Hughes testified that she never indicated to Heidke that she was "complacent"[5] in the sexual assault.

**MBU's Investigation**

On September 1, 2017, Heidke informed Dr. Andy Chambers, MBU's Senior Vice President for Student Development and Associate Provost, of Hughes's allegations and provided Chambers with a copy of his preliminary report.  At that time, Chambers served as MBU's Title IX Coordinator.  Chambers directed Heidke to conduct a Title IX

---

[4]     There is no indication in the record that MBU was in any way involved in or responsible for writing this message.

[5]     Although the parties use the term "complacent," the Court assumes from the context in which the term is used that the parties mean "complicit."

investigation into Hughes' complaints and to assign tasks to another MBU public safety officer trained in Title IX investigations, Joe Edwards.

On the same day, Heidke met with FS to take the first of three statements that FS would provide during the investigation.  According to Heidke's summary of this first statement, FS reported that Hughes did tell him to stop trying to have sex with her twice and that he stopped.  But FS further reported that he was "confused" by Hughes's admonitions to stop because they kept "making out" and that Hughes "finally agreed to have sex."  ECF No. 44 at ¶ 46; ECF No. 30-12, Def.'s Ex. 12.  FS also stated that Hughes was not upset with him until he later told her that he was not looking for a long-term relationship.  *Id.* at ¶ 47.  During the September 1, 2017 meeting, Heidke directed FS not to have contact with Hughes in any form.  MBU's Director of Athletics, Thomas Smith, also instructed FS to have no contact with Hughes during the investigation and to cease any discussion about Hughes with his friends and teammates.

Also on September 1, 2017, Hughes met with her MBU volleyball coach to report the sexual assault.  The coach immediately took Hughes to MBU's Associate Dean of Students, Kimberly Grey, and Hughes reported to Grey information similar to that reported to Heidke the day before.

Hughes travelled to Memphis, Tennessee, in the following days to visit her sister, and there she filed a Memorandum with the Memphis Police Department regarding the August 19, 2017 sexual assault.  At no time prior to this occasion did an MBU public safety officer call a police department regarding Hughes's allegations; nor did MBU give Hughes guidance in contacting a police department.  However, pamphlets created by

5

Heidke with information and resources for victims were made available to MBU students in MBU's Office of Public Safety.

Hughes met with several university officials while the investigation was underway. On September 11, 2017, Hughes and her mother met with Chambers, Grey, and Heidke for an in-person meeting to discuss the investigation and to ensure that MBU would create a "safe circle" on campus for Hughes.  On September 19, 2017, Hughes met with Grey and provided the names of individuals she believed would have information relevant to the investigation, including her roommates.  Hughes also described several more recent incidents in which MBU football players who were friends of FS harassed her, including holding up the number "9" and saying "Big R" around her, in reference to her allegations against FS.  Grey gave Hughes contact information for a counselor at a Mercy clinic.  Following the September 19, 2017 meeting, Hughes repeatedly complained to MBU about the harassment by other students related to her allegations against FS.  MBU met with Hughes and responded to her emails regarding these complaints.  However, there is no evidence that MBU disciplined any of these other students as a result of Hughes's complaints.

As part of the investigation, Heidke and Edwards collected statements from each of the witnesses suggested by Hughes to have relevant information, as well as two additional statements from FS, made on September 27, 2017 and October 10, 2017, respectively.  MBU's report of the September 27, 2017 interview with FS reflects that FS stated that he and Hughes had sex on the night in question and that, during the encounter, FS told Hughes that he did not "see [him]self" as Hughes's boyfriend, which upset her.

6

*See* ECF No. 30-10, Def.'s Ex. 10.   In a written statement dated October 10, 2017, FS stated for the first time that on the night in question, Hughes took her clothes off first, grabbed his genitals and pressed them against her, asked him to be her boyfriend during the sexual intercourse, and when FS said he did not "see [Hughes] like that," Hughes asked him to stop, which he did.  *See* ECF No. 30-13, Def.'s Ex. 13.

Also as part of the investigation, Heidke collected and forwarded to Chambers two photographs of Hughes partially undressed.  Neither of the photographs was taken on the night of the incident in question.  Rather, one was of Hughes at a party following the initiation of the investigation, and another Hughes purportedly sent to FS prior to August 19, 2017.  It is not clear from the record why Heidke forwarded the photographs to Chambers or what relevance he believed they had.

On September 25, 2017, MBU named FS "Athlete of the Week."  And later, on October 9, 2017,  MBU selected FS to pose for promotional materials for the school.  The photoshoot took place in front of Hughes's residence hall, and the photographer requested to use a hammock belonging to Hughes in the promotional photographs.  The record does not contain further detail about FS's "Athlete of the Week" award, the promotional photoshoot, or the request to use Hughes's hammock.  For example, the record does not contain evidence regarding the qualification or basis for such an award, or whether MBU's Director of Athletics or any other MBU official with knowledge of Hughes's complaint against FS at that time was involved in or aware of the decisions to select FS for the award or promotional photographs or of the request the use of Hughes's hammock for the photographs.  Nor does the record contain evidence of Hughes's

response to the request to use her hammock or whether the hammock was in fact used in the photographs.  However, it is undisputed that Chambers had no prior knowledge of these events and that Chambers was not aware of the photoshoot at the time that it occurred.

Also in the fall of 2017, MBU learned that FS had contacted Hughes's brother to state that he (FS) was worried about Hughes's mental health and that Hughes looked "too skinny."  MBU did not discipline FS for this contact.

**MBU's Conclusion Following Investigation**

As Title IX Coordinator, Chambers reviewed all information obtained during the investigation.  Prior to informing Hughes or FS about the outcome of the investigation, Chambers met with MBU's football coach to gather information about what an appropriate sanction against FS would be considering the length of the football season.

On October 12, 2017, Chambers and Grey met with Hughes to inform her that he could not find by a preponderance of the evidence that FS lacked Hughes's consent or that FS violated MBU's Sexual Assault and Relationship Violence Policy.  Chambers also provided Hughes with a written decision to this effect.  *See* ECF No. 30-21, Def.'s Ex. 21.  However, Chambers stated that he did find that FS's conduct violated MBU's Statement on Sexual Behavior and Resident Life Policy, because FS admitted to engaging in sexual acts on campus in violation of that policy.  Chambers told Hughes that she could be punished for violating the same Statement on Sexual Behavior and Resident Life Policy because she admittedly removed her clothing in the vehicle with FS, but Chambers stated that he had decided against such punishment because he believed it

would not be appropriate.  Chambers also discussed with Hughes the photographs provided to him by Heidke, in which Hughes was partially undressed, and Chambers recommended that Hughes receive counseling so that she would not find herself in similar situations in the future.

Chambers and Grey met with FS privately and notified him of the outcome of the investigation.  Chambers also provided FS written documentation of his decision.  *See* ECF No. 30-23, Def.'s Ex. 23.  As a result of the determination that FS violated MBU's Statement on Sexual Behavior and Resident Life Policy, MBU issued several sanctions against FS, including: placing him on disciplinary probation for the duration of the Fall 2017 semester, requiring his participation in MBU's Restorative Justice Program, and suspending him from participating in MBU football team practices, games, and other activities for approximately one week, from October 6, 2017 through October 12, 2017. FS completed his Restorative Justice Plan.[6]

Other than the complaints by Hughes, MBU did not receive any complaints accusing FS of sexual misconduct or other violent behavior either before or after the events in question.

**Ex Parte Order of Protection and Post-Investigation Harassment**

On October 12, 2017, following her meeting with Chambers and Grey regarding Chambers's decision, Hughes requested and received from the St. Louis County Circuit

---

[6]      MBU's documentation regarding FS's participation in the Restorative Justice Plan indicates that the plan required mentorship, written reflection, and community service. ECF No. 30-24, Def.'s Ex. 24.

Court an Ex Parte Order of Protection ("Ex Parte Order") against FS.  *See* ECF No. 30-25, Def.'s Ex. 25.  The Ex Parte Order required FS to refrain from stalking Hughes, entering her dormitory, entering the premises of her school, entering the premises of her employment, coming within 100 feet of her, communicating with her in any manner, or coming to her volleyball games.  *See id.*  The following day, October 13, 2017, Heidke served the Ex Parte Order on FS and performed a wellness check on Hughes upon the request of Hughes's father.

Also on October 13, 2017, the St. Louis County Circuit Court held a hearing with respect to the Ex Parte Order.  Hughes and FS both appeared at the hearing with counsel.  FS's attorney was Dan Leslie, the one-time Director of Football Operations for MBU.[7]  At this hearing, Leslie called Heidke as a witness.  Heidke testified about Hughes's complaint against FS in August of 2017 and his investigation into that complaint, including the photographs of Hughes partially undressed, which, according to Heidke, were provided to him by FS and one of FS's football teammates.   Heidke further testified that Hughes told him that she and FS had "hooked up" prior to August of 2017.   *See* ECF

---

[7]      The parties dispute whether Leslie was employed by MBU at the time of the hearing. Hughes claims that Leslie was the Director of Football Operations and adjunct professor at MBU at the time by pointing to a screenshot of the MBU athletics website dated November 14, 2017, which listed Leslie as the Director of Football Operations. *See* ECF No. 37-9, Pl.'s Ex. H.  MBU objects that the screenshot has not been authenticated and is therefore inadmissible.  MBU also denies that Leslie was an employee at the time of the hearing, citing an affidavit by Chambers submitted in this case in which Chambers attests that Leslie was not employed by MBU at the time he (Leslie) represented FS and that MBU did not compensate, arrange, or facilitate Leslie's representation of FS.  *See* ECF No. 30-1, Def.'s Ex. 1, at ¶ 20.

No. 37-3, Pl.'s Ex. B.  At the conclusion of the hearing, the St. Louis County Circuit Court took the matter under advisement and did not issue a ruling immediately.

In connection with the requirements of the Ex Parte Order, MBU undertook several measures in order to minimize the likelihood of encounters between Hughes and FS, including directing FS not to be in the cafeteria when Hughes was present, changing FS's building access, reviewing course and exam schedules to see if alterations were necessary, and advising staff to monitor school events where both parties would be in attendance.

On October 16, 2017, Heidke contacted the Clerk of the St. Louis County Circuit Court to seek clarification on the Ex Parte Order, as he believed the Order would effectively bar FS from the small MBU campus.  On the same day, Hughes reported to MBU's Office of Public Safety and then the Creve Coeur Police Department ("CCPD") that she saw FS sitting in the MBU cafeteria when she was there, which she believed violated the Ex Parte Order, but that FS had not attempted to contact her.  MBU did not discipline FS as a result of Hughes's complaint.[8]

The following day, October 17, 2017, the St. Louis County Circuit Court issued an Addendum to the Ex Parte Order ("Addendum") that allowed FS to "attend [MBU] and [MBU]-related activities and functions" subject to the terms of the Ex Parte Order.   The Addendum also required Hughes and FS to provide copies of the Addendum to MBU administration "in order for them to make appropriate accommodations."  ECF No. 30-

---

[8]     It is unclear from the record what, if anything, CCPD did in response to Hughes's complaint.

11

29, Def.'s Ex. 29.  The St. Louis County Sheriff's office provided a copy of the Addendum to Heidke.

The same day, October 17, 2017, Heidke informed Hughes and her father by telephone that MBU had instructed FS "not to eat his meals in the [MBU] café and if [Hughes] appeared or was also present then he was to remove himself immediately." ECF No. 44 at ¶ 93.  Around this time, MBU also offered to move Hughes's dormitory room, but Hughes declined.

After the issuance of the Addendum, Hughes reported several instances in which she believed FS violated the Ex Parte Order.  On October 18, 2017, Hughes reported to MBU's Office Public Safety and CCPD that she believed FS was violating the Ex Parte Order by attending MBU's "Mr. Spartan" competition and "staring at her."  CCPD came to MBU's campus, talked to FS, and warned him not to stare at Hughes, to follow the rules that MBU had given him, and to follow the conditions set forth in the Ex Parte Order.  However, CCPD did not make any arrest, and the officers also provided Hughes with a copy of the Addendum.

As Hughes was speaking to CCPD on October 18, 2017, Heidke approached her and accused her of lying about having been previously told by Heidke that FS must leave any area in which Hughes appeared.  *See* ECF No. 30-5, Hughes dep. 125:2-126:13. MBU also investigated Hughes's complaint regarding the Mr. Spartan event and found that FS had prior approval from MBU to attend the event and that there was no evidence that FS was staring at Hughes during the event.

On October 20, 2017, Hughes reported to MBU's Office of Public Safety that FS had entered the school's Academic Success Center while she was also there to attend a meeting.  In response to Hughes's complaint, MBU reviewed security camera footage of the Academic Success Center, which, according to MBU,[9] showed that FS left immediately.  MBU therefore determined that FS did not violate the Ex Parte Order because he did not attempt to communicate with Hughes.

On October 25, 2017, Hughes reported to MBU's Office of Public Safety that FS had entered the MBU café, sat down, and stared at her while she ordered and ate her lunch, which she believed violated the Ex Parte Order.  MBU reviewed the security camera footage and again determined that FS did not violate the Ex Parte Order because, according to MBU, the footage showed FS asleep by the television when Hughes was present and did not show FS attempting to communicate with Hughes.

On October 26, 2017, Hughes reported to the MBU Office of Public Safety that FS had walked into her residence hall, staring at her the entire time.   An MBU public safety officer, Robert Walsh, called Heidke to ask whether CCPD should be called.  According

---

[9]      MBU references this footage and other surveillance or security camera footage in affidavits of its officials, in which they describe their investigations into Hughes's various complaints against FS.  *See, e.g.*, ECF No. 30-16, Def.'s Ex. 16.  Hughes disputes that any of videos demonstrates that FS did not violate the Ex Parte Order.  Neither party has produced copies of these videos to the Court.  However, because Hughes has not properly disputed MBU's perception of what the videos depicted, and neither party has produced copies of the videos to the Court, the Court will accept as true that MBU perceived the videos to depict the contents described.

to Hughes, Heidke stated that Hughes was "lying" with respect to her complaint.[10]  An

MBU public safety officer[11] told Hughes that she did not need to call CCPD because

CCPD would not be able to do anything about the incident.

Heidke reviewed security camera footage and determined that FS had not violated

the Ex Parte Order, because, according to Heidke, FS only entered the building to place a

work order with an MBU housing employee and FS did not attempt to communicate with

Hughes.

**Full Order of Protection and Continued Harassment**

On October 30, 2017, based on the evidence presented at the October 13, 2017

hearing, the St. Louis County Circuit Court entered a Full Order of Protection (the "Order

of Protection") against FS.  ECF No. 30-34, Def.'s Ex. 34.  The Order of Protection

stated that the court found, pursuant to Mo. Rev. Stat. § 455.050, that Hughes had proven

allegations of domestic violence, stalking, and/or sexual assault against FS and the court

further found that FS represented a credible threat to the safety of Hughes.  *Id.*  The Order

of Protection required FS to not communicate with Hughes in any manner or through any

medium, including social media; to not "harass, stalk or threaten [Hughes] or engage in

---

[10]     In support of this fact, Hughes has submitted an affidavit attesting that she
reviewed body camera footage of the call between Walsh and Heidke in which Heidke
can be overheard stating that Hughes was "lying."  *See* ECF No. 37-5, Pl.'s Ex. D, at ¶
12.  MBU objects that the video does not contain discernable audio of Heidke and denies
that he called Hughes a "liar."  *See* ECF No. 44 at ¶ 102.  The video has not been
presented to the Court as evidence, but the Court will presume that Hughes could present
evidence of this fact in admissible form at trial.  *See* Fed. R. Civ. P. 56(c)(2).

[11]     It is unclear from the record whether this officer was Walsh.

other conduct that would place [Hughes] in reasonable fear of bodily injury"; to keep 100 feet from Hughes "except at school functions that are public"; and to not attend MBU's volleyball games.  *Id.*  Heidke made all officers in MBU's Office of Public Safety aware of the Order of Protection and also made the documents available in the Office of Public Safety for any officers to review.

After the issuance of the Order of Protection, Hughes continued to report to MBU incidents of harassment involving FS and his friends.  On November 1, 2017, Hughes informed Grey that FS's friends used code words around her and encouraged others not to be friends with her.  In response, MBU's head football coach, Jason Burianek, met with the entire football team and directed them to cease any negative comments about Hughes, further informing them that they would face disciplinary action if they engaged in any negative communications involving Hughes, whether in-person, on social media, or through non-verbal communication.  ECF No. 30-35, Def.'s Ex. 35.

On November 6, 2017, Hughes emailed Grey and indicated that she wished to move to a different dormitory room because her roommates were romantically involved with FS's friends and teammates, and Hughes felt the atmosphere in her current dormitory room had worsened as a result.  As noted above, Hughes had declined MBU's offer to move dormitory rooms approximately one month earlier.  However, in response to Hughes's request, in November of 2017, MBU found Hughes a new dormitory room and ensured that her new roommates were not friends with FS.

On November 7, 2017, MBU provided both FS and Hughes with guidelines that MBU created to enforce the Order of Protection.  *See* ECF No. 30-39, Def.'s Ex. 39.

These guidelines prohibited FS from entering Hughes's residence hall for any reason; using the laundry facilities located in Hughes's residence hall; attending any MBU volleyball game; communicating in any manner with Hughes; or coming within 100 feet of Hughes except at public MBU events.  The guidelines permitted FS to attend school-related activities subject to the terms of the Order of Protection and provided that FS should seek guidance from MBU's Office of Public Safety as to any questions regarding his ability to attend a particular event.  The guidelines further provided that if Hughes entered a public campus facility or event and discovered FS was already present, she should conduct her business as needed but should avoid seeking FS out or intentionally creating a situation that could be construed as a violation of the Order; and that, in an effort to minimize campus disruption resulting from the involvement of local police in the enforcement of the Order, unless Hughes deemed herself to be in imminent danger, Hughes should first report any potential violations of the Order to the MBU Office of Public Safety before contacting local law enforcement.  *Id.*

On November 13, 2017, Hughes reported to MBU's Office of Public Safety that FS entered the school gym to watch a basketball game and sat in the bleachers below her, as she recorded the game as part of her sports management class. A MBU public safety officer investigated the complaint and ultimately determined that FS did not violate the Order of Protection because the Order permitted FS to attend school functions.  Hughes also reported the incident to the CCPD, which likewise determined that FS was allowed to be at public events, such as basketball games.

On November 25, 2017, Hughes reported to MBU's Office of Public Safety that FS was present in the cafeteria at the same time as her and sat one table away.  An MBU public safety officer reviewed the surveillance footage and determined that FS did sit near Hughes in the cafeteria but did not attempt to communicate with her.

On November 29, 2017, Hughes reported to MBU's Office of Public Safety that FS was standing outside the door to her classroom when she exited, in violation of the Order of Protection.  FS told MBU public safety officer Edwards that he was mistakenly outside Hughes's classroom and that it would not happen again.  There is no evidence in the record that MBU disciplined FS for this incident.  Hughes later met with Edwards at his request, in order to discuss MBU's response to FS being outside of Hughes's classroom.  At this time, Edwards provided Hughes with updated MBU guidelines for enforcement of the Order of Protection.  The updated guidelines required that when FS attended public campus events, he maintain a "reasonable distance" from Hughes.

On December 6, 2017, Hughes again reported to MBU's Office of Public Safety that FS entered MBU's cafeteria, sat one table over, and stared at her.  An MBU public safety officer reviewed the security camera footage and determined that FS did sit near Hughes and did look at her.  However, MBU did not discipline FS for this incident.

On December 12, 2017, Hughes reported to MBU's Office of Public Safety that FS's car was parked in her assigned parking lot, for which she had a valid permit but FS did not.  MBU public safety officer Walsh responded to the call and escorted Hughes to her dormitory room.  Walsh placed a warning on FS's car rather than a parking citation, purportedly because it was MBU's practice to allow students to park in that lot after a

certain time in the evening. Walsh left a note on the warning expressly informing FS that it was Hughes that reported his car being in the wrong lot.[12]  FS later posted a picture of the warning on social media, which according to Hughes, triggered more harassment against her.

In addition to responding to Hughes's reports, MBU also excused her from attending chapel, a mandatory course requirement, in early December 2017, as she did not want to be near FS.  Hughes still received credit for the mandatory course.

Hughes completed the fall 2017 semester at MBU, during which she passed all courses.  She then withdrew from MBU and transferred to Carson Newman University for the spring 2018 semester, where she graduated with a bachelor's degree in business administration in May 2020.

**Lawsuit in this Court**

Hughes filed suit in this Court on August 19, 2019.  Hughes asserts that MBU violated Title IX because it was deliberately indifferent to actual notice of sexual discrimination and sexual harassment (Count I); that MBU acted negligently by breaching its duty of care to Hughes to protect her from harassment on school premises (Count II); and that MBU breached contractual obligations owed to Hughes, its student, by failing to provide an adequately safe living and suitable educational environment (Count III).

---

[12]     Nothing in the Order of Protection specifically limited where FS could park his car, and there is no suggestion that Hughes was present when FS parked his car on this occasion.

18

MBU asserts that it is entitled to summary judgment on all counts because: (1) no reasonable jury could conclude that MBU was deliberately indifferent to actual notice of discrimination, (2) Hughes has not established that MBU owed a duty to protect her under Missouri law, and (3) Hughes has not identified any enforceable contract that she entered with MBU.

In response, Hughes asserts that a reasonable jury could conclude that MBU's investigation and response to Hughes's complaints of sexual assault by FS and sexual harassment by FS and other students was clearly unreasonable so as to demonstrate deliberate indifference.  As to her negligence claim, Hughes argues that the facts of this case demonstrate a special relationship between MBU and Hughes that gave rise to a duty to protect her.  Finally, Hughes argues that contractual obligations arose from Hughes's implied agreement to pay tuition to and play volleyball for MBU in exchange for MBU providing her education and complying with the Student Handbook, and that there are genuine issues of material fact as to whether those obligations were breached.

## DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party."  *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

19

In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens Loan and Sav. Co.*, 621 F.2d 911, 913 (8th Cir. 1980). Rather, the plaintiff "must identify and provide evidence of specific facts creating a triable controversy." *Howard*, 363 F.3d at 800 (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

I.      **Count One: Title IX**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Student-on-student sexual assault and sexual harassment constitute forms of sex discrimination under Title IX. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021).

Victims of student-on-student sexual assault or sexual harassment have a private right of action for damages against educational institutions like MBU that receive federal funding. *Shank*, 993 F.3d at 573. But an educational institution is only liable under Title IX for "its own misconduct." *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (citing *Davis*, 526 U.S. at 640).

20

"A plaintiff seeking to prove a Title IX violation in the wake of a peer sexual assault must establish that the institution was: (1) deliberately indifferent, (2) to known acts of discrimination, (3) which occurred under its control." *Shank*, 993 F.3d at 573 (citation omitted).  "A Title IX plaintiff is also required to show the discrimination was so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." *Id.* (citation omitted).  Finally, "[t]o be actionable an institution's deliberate indifference must either have caused the harassment or made students vulnerable to it." *Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014).

"Deliberate indifference is a stringent standard of fault that cannot be predicated upon mere negligence." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010)).  In the Title IX context, deliberate indifference to peer harassment requires a showing that the educational institution's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  This "clearly unreasonable" standard is intended to afford flexibility to school administrators and prevent courts from "second-guessing the disciplinary decisions made by school administrators." *Dardanelle*, 928 F.3d at 726.  Such flexibility is particularly important when considering administrators' dual interests in protecting the rights of student victims and those of students accused of sexual misconduct.  *See Doe v. Univ. of Arkansas – Fayetteville*, 974 F.3d 858, 868 (8th Cir. 2020) (holding that a university's mishandling of a sexual misconduct disciplinary proceeding gave rise to a plausible Title IX claim by the accused).

Hughes argues that the facts in this case, viewed in their totality and in the light most favorable to Hughes, would permit a jury to find that MBU's handling of its investigation into and response to Hughes's complaints of discrimination were "clearly unreasonable."   Specifically, Hughes points to the facts that Chambers accepted and examined inappropriate and irrelevant photographs of Hughes; Chambers indicated that he believed Hughes was also in violation of MBU's policy and suggested she get counseling to avoid finding herself in similar situations in the future; Chambers apparently disregarded or did not give significant weight to FS's contradictory statements regarding the alleged sexual assault; MBU awarded FS "Athlete of the Week" and featured him in promotional materials, including in Hughes's dormitory building, and requested to use Hughes's hammock in those materials, all of which occurred after MBU received Hughes's complaint of sexual assault by FS; an MBU employee or former employee represented FS at the Order of Protection Hearing and Heidke also testified as a witness for FS; MBU did not discipline FS as a result of Hughes's complaints regarding his alleged violations of the Order of Protection and of MBU's no-contact directive; MBU did not discipline any other students as a result of Hughes's complaints of harassment; Heidke accused Hughes of lying regarding one of her complaints that FS violated the Order of Protection; an MBU public safety officer informed FS that Heidke was the one who reported FS's parking violation; and MBU failed to report to law enforcement Hughes's complaints that FS violated the Order of Protection.

Some of these facts give the Court pause.  For example, it is concerning that Heidke and Chambers not only considered but mentioned in open court and to Hughes,

respectively, photographs of a partially undressed Hughes that had little or nothing to do with the sexual assault in question, and that FS was represented at the hearing on the Ex Parte Order by a current or former MBU employee.[13]  But the question is not whether MBU's actions were commendable or even adequate.  The question is whether they were "clearly unreasonable."  And on this record, even viewed in the light most favorable to Hughes, no reasonable jury could find that they were.[14]

It is undisputed that as soon as soon as MBU received notice of Hughes's complaint of sexual assault, it initiated an investigation that included separate interviews of Hughes and FS, and interviews of each of the witnesses identified by Hughes.  MBU also directed FS not to contact Hughes.  It is also undisputed that, after Hughes obtained the Ex Parte Order and Order of Protection, MBU implemented several measures to minimize encounters between Hughes and FS on the small campus, including changing FS's building access, reviewing course and exam schedules to see if changes were necessary, creating guidelines to enforce the Order of Protection on campus, and excusing Hughes from a mandatory course while still giving her credit.  Finally, it is

---

[13]    On the other hand, even assuming that MBU employed attorney Leslie at the time of the hearing, as Hughes contends, Hughes has not suggested or presented evidence that MBU compensated Leslie for his representation of FS or otherwise facilitated or assisted with that representation.  As to other MBU actions highlighted by Hughes, such as advising FS of the reason why a warning ticket was placed on his car or failing to discipline FS or report him to law enforcement in those instances where MBU found that FS did not violate the court orders, the Court concludes such actions were patently reasonable.

[14]    Because the parties do not argue the point, the Court will assume without deciding that FS's alleged harassment was both based on Hughes's sex and sufficiently severe to give rise to a Title IX claim.

undisputed that MBU responded to and investigated every complaint by Hughes that FS was violating the court orders, and after review of video found some of the complaints to be unsupported.

That Hughes believed MBU should have done more or reached different conclusions is insufficient to create a triable issue as to whether MBU was deliberately indifferent to her complaints.  "Victims of peer harassment do not have a Title IX right to make particular remedial demands."  *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (citation omitted).  The Eighth Circuit has so held on numerous occasions and on facts similar to those presented here.  *See, e.g.*, *Pearson v. Logan Univ.*, 937 F.3d 1119, 1125 (8th Cir. 2019) (per curiam) (holding that a university was not deliberately indifferent as a matter of law where it investigated a female student's allegations of stalking and harassment by a male student and, after determining there was insufficient evidence to support the allegations, still instructed the students to have no contact with each other and offered to move the female student's work-study location); *Maher*, 915 F.3d at 1213 (holding that a university's no-contact order and offer of alternative housing to a rape victim was not "clearly unreasonable" as a matter of law, notwithstanding university's refusal to move the alleged assailant's housing before the investigation had concluded);  *Ostrander*, 341 F.3d at 751 (holding that a university was not deliberately indifferent to a plaintiff's complaint of peer sexual assault while in a campus fraternity house where the university contacted local and national fraternity leadership and asked the fraternity to investigate the allegations and sponsor a required training program but did not otherwise investigate or sanction the fraternity).

24

As to Hughes's complaints of harassment by students other than FS, assuming without deciding that this harassment was based on Hughes's sex and also sufficiently severe, the Court likewise concludes as a matter of law that MBU's response was not clearly unreasonable.  Again, it is uncontroverted that MBU responded to Hughes's complaints by warning the football team that they would face consequences for engaging in negative communications involving Hughes and that MBU offered to and ultimately did move Hughes's dormitory room in response to Hughes's complaints about her roommates.  Title IX does not require more.

Nor has Hughes demonstrated a genuine issue for trial as to causation. Importantly, Hughes does not argue that MBU's actions or inactions caused the sexual assault; MBU undisputedly had no notice that FS posed any danger prior to that assault. Rather, Hughes contends that MBU's actions or inactions caused the post-assault harassment by FS and other students or made Hughes vulnerable to that harassment.  But Hughes has not clearly articulated her theory of causation, let alone identified evidence in support of it.  The Court cannot say that the record supports that MBU either caused the harassment or made Hughes vulnerable to it.  For all of these reasons, the Court will grant MBU's motion for summary judgment as to Hughes's Title IX claim of deliberate indifference.[15]

---

[15]    Because the Court has diversity jurisdiction and not just supplemental jurisdiction over Hughes's state-law claims, it will proceed to address Hughes's state-law claims notwithstanding the dismissal of her federal claim. *Cf. Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims

25

II.    **Count Two: Negligence**

To establish a negligence claim in Missouri, Hughes must show: (1) MBU had a duty to protect Hughes from injury, (2) MBU breached that duty, and (3) MBU's breach proximately caused injury to Hughes.  *See Pearson*, 937 F.3d at 1127 (citing *Lopez v. Three Rivers Electric Coop.*, 26 S.W.3d 151, 155 (Mo. 2000)).  For the purpose of summary judgment, MBU challenges only the first element.

Whether a duty exists is a question of law.  *Id.*  Again, Hughes does not argue that MBU's negligence caused the sexual assault.  Rather, Hughes contends that MBU was negligent in responding to her subsequent claims of non-physical harassment by FS and other students.

In general, a college does not owe a duty to protect its students.  *Pearson*, 937 F.3d at 1127 (citing *Nickel v. Stephens College*, 480 S.W.3d 390, 401 n.8 (Mo. Ct. App. 2015); *see also Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003) ("[T]he general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students.").  Missouri recognizes two "special circumstances" constituting an exception to the general rule.  *Pearson*, 937 F.3d at 1127.

First, "a duty may arise when a person, known to be violent, is present on the premises or an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury."  *Id.* (citing *Faheen v. City Parking Corp.*, 734 S.W.2d 270, 273 (Mo. Ct. App. 1987)).  Second, a duty may arise with respect to

---

are dismissed without prejudice to avoid needless decisions of state law as a matter of comity and to promote justice between the parties.").

danger posed by unknown third persons where "specific incidents of violent crimes on the premises are sufficiently numerous and recent to put a defendant on notice, either actual or constructive, that there is a likelihood third persons will endanger the safety of defendant's invitees." *Id.*  Both "the special facts exception involving known third persons inflicting harm [and that involving] unknown third persons inflicting harm . . . involve situations of extraordinary danger." *Faheen*, 734 S.W.2d at 274.

Hughes contends that a special circumstance arose here because MBU had actual notice of the danger posed by FS after Hughes reported a sexual assault by FS and a court of law issued an Order of Protection against FS.  Thus, Hughes appears to invoke the first exception, involving known third persons inflicting harm.[16]

In *Pearson*, the Eighth Circuit held that a female student's reports to a university that a male student was stalking and harassing her and that he had once pressed against her but possibly by accident failed to give rise to a duty to protect her from further stalking and harassment by the student.  937 F.3d at 1121.  The Eighth Circuit held that these facts failed to establish a special circumstance for the purpose of a negligence claim under Missouri law because the female student had not shown sufficient facts would have alerted the university to an extraordinary danger posed by the male student.  *Id.* at 1127. Of particular importance, the court noted that "[t]he only complaint involving any actual touching by [the male student] was acknowledged to be a possible accident . . . ." *Id.  But*

---

[16]    To the extent that Hughes attempts to rely on the second exception, involving the risk of harm by unknown third persons, Hughes has not alleged the sort of violent, numerous, and recent crimes that would be necessary to put MBU on notice of a risk to Hughes's safety by unknown third persons.  *See Pearson*, 937 F.3d at 1127.

*see id.* at 1128 (Kelly, J., concurring in part and dissenting in part) (finding that the record supported the existence of a duty and "[t]he fact that [the female student's] complaints included only one instance of 'actual touching' [did] not diminish the potential danger inherent in her allegations [because] Missouri law recognizes that an individual may conduct himself so as to indicate danger without having engaged in any physical contact").

Here, by contrast, Hughes presents evidence that she reported to MBU a sexual assault by FS and, notwithstanding its own finding of insufficient evidence to support Hughes's allegation, MBU was well aware that a state court found that FS presented a credible threat to Hughes's safety.  Viewing this record in the light most favorable to Hughes and giving her the benefit of all reasonable inferences as the Court must on summary judgment, the Court concludes that Hughes has established that MBU had a duty of care to protect her against stalking and harassment by FS.[17]

Because MBU does not assert any argument with respect to the remaining elements of Hughes's negligence claim, the Court will deny MBU's motion for summary judgment on that claim.

### III.   **Count Three: Breach of Contract.**

"To state a claim for breach of contract under Missouri law, [a plaintiff] must establish the existence of a valid contract, *the rights of plaintiff and obligations of defendant under the contract*, a breach by defendant, and damages resulting from the

---

[17]     The evidence is insufficient to create a triable issue as to whether MBU had a duty to protect Hughes from harassment by students other than FS.

28

breach." *Gillis v. Principia Corp.*, 832 F.3d 865, 871 (8th Cir. 2016) (emphasis in original) (citing *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013)).  For the purpose of summary judgment, MBU challenges only whether Hughes has established the existence of a valid contract with identifiable and enforceable promises.

Hughes argues that she and MBU "established a valid contract implied in fact with one another, the rights of [Hughes] to receive an education upon payment of tuition and the obligations of MBU as referenced in its Student Handbook and referenced policies and procedures," that MBU "breached the contractual agreement by not following the terms of the aforereferenced documents," and that Hughes was thereby "was materially damaged mentally, emotionally and monetarily . . . ."  ECF No. 36 at 32.

"[A]n educational institution's brochures, policy manuals and other advertisements may form the basis of a legally cognizable contractual relationship between the institution and its students." *Lucero*, 400 S.W.3d at 5.  But "not every dispute between a student and a university is amenable to a breach of contract claim." *Id.* "Rather, in order to assert a breach of contract claim against a university, a student plaintiff must point to an identifiable contractual promise that the university defendant failed to honor." *Id.*  "Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that universities must be allowed the flexibility to manage themselves and correct their own mistakes." *Id.* at 8 (citation omitted).

Hughes asserts that the following statements in the Student Handbook constitute contractual promises: (1) MBU's statement in its Student Conduct Code that that "[a]ny conduct violation of local, state, or federal laws, or any indecent or disorderly conduct disruptive of the orderly process of the University educational program, may be grounds for disciplinary action"; (2) MBU's statement in its Nondiscrimination Policy that "[a]ll complaints [of sexual harassment] will be promptly, thoroughly, and impartially investigated, and brought to a resolution within a reasonable time frame at each step of the process.  In the event that a determination is made that an act of discrimination has occurred, appropriate corrective and remedial actions will be promptly taken."; and (3) MBU's statement in its Notice of Family Educational Rights and Privacy Act (FERPA) that MBU is permitted to disclose personal identifying information from educational records without obtaining prior written consent of the student in certain situations, such as in order to comply with a judicial order or a lawfully issued subpoena.[18]  *See* ECF No. 36 at 33-35; ECF No. 30-4, Def.'s Ex. 4 at pp. 44, 51-53; 59-61.

Hughes also points to the definitions of terms such as "consent," "stalking," and "sexual assault" in MBU's Sexual Assault and Relationship Violence Policy, contending that these evidence contractual promises on the part of MBU to adhere to these definitions when investigating and resolving student complaints, and that MBU breached

---

[18]     Hughes contends that this last alleged promise was breached when Heidke testified about his Title IX investigation during the St. Louis County Circuit Court's hearing on the Ex Parte Order.

such promise by inadequately investigating and responding to Hughes's complaints.  *See* ECF No. 36 at 34-35.

In *Lucero*, the Missouri Court of Appeals held that a student's breach of contract claim failed as a matter of law to the extent it was based on the university's alleged failure to sufficiently comply with handbook policies for monitoring faculty.  *Lucero*, 400 S.W. 3d at 8.  The court noted that "the claim, whether identified as one for breach of contract. . . , or perhaps more accurately as one sounding in tort, raises questions concerning the reasonableness of the educator's conduct in providing educational services and, as such, is one of educational malpractice, which Missouri courts have recognized as a non-cognizable claim."  *Id.* (cleaned up and citations omitted).  The same is true for Hughes's contract claim.  Hughes, like the student in *Lucero*, effectively requests this Court to supervise MBU's internal procedures for monitoring and disciplining its students.  *See id.*  As in *Lucero*, the Student Handbook provisions relied upon by Hughes cannot form the basis for her breach of contract claim.  *See id.* at 9.  The Court will grant MBU's motion for summary judgment on that claim.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED in part and DENIED in part**, as set forth above.   ECF No. 28.  The only claim remaining for trial is Plaintiff's negligence claim (Count II).

_____
AUDREY G. FLEISSIG

31

UNITED STATES DISTRICT JUDGE

Dated this 21st day of May, 2021.